**FILED**

JAN 1 6 2016

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO PINEDA GOMEZ, | No. C 13-01790 BLF (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| GREG LEWIS, Warden, | |
| Respondent. | |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why the petition should not be granted.  Respondent has filed an answer addressing the merits of the petition.  Petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

## PROCEDURAL HISTORY

On October 20, 2010, a trial court in Monterey County found Petitioner guilty of

---

[1]This matter was reassigned to this Court on April 17, 2014.

ten crimes: attempted premeditated murder of victim #1 (Raul) (count 1); assault with a firearm, a handgun, against victim #1 (count 2); attempted premeditated murder of victim #2 (Taji) (count 3); assault with a firearm, a handgun, against victim #2 (count 4); shooting at an occupied motor vehicle (count 4); street terrorism (count 6); attempted solicitation of murder (count 7); dissuading a witness by force or threat (count 8); attempted solicitation of a crime, perjury and subornation of perjury (count 9); and street terrorism (count 10).  Petitioner committed the first six crimes on or about September 2, 2007, and the last four on or about June 5, 2008.  The trial court also found true all charged enhancements, including that the crimes were committed for the benefit of a street gang, a principal discharged a firearm in counts 1-4, and Petitioner had suffered a prior conviction that was both a "strike" and a prior serious felony conviction.  (Ans. at 1.)

Petitioner was sentenced to a total determinate sentence of twenty-five years and a consecutive total indeterminate sentence of four life terms with a minimum eligibility for parole after 67 years, although the abstract of judgments stated 77 years. (*Id.*)

Petitioner filed a direct appeal to the California Court of Appeal, which affirmed the conviction and judgment with two exceptions: it directed the trial court to amend the abstract of judgment to reflect a sentence of 67 years to life instead of 77, and to change the conviction in count 9 to an attempt to solicit perjury. (Ans. Ex. I at 16.)  The state appellate court summarily denied Petitioner's petition for a writ of habeas corpus on the same day, *i.e.*, on August 31, 2012. (*Id.*, Ex. J.)

The California Supreme Court summarily denied review on direct appeal, (*id.*, Ex. L), and denied Petitioner's state habeas petition, (*id.*, Ex. M).

Petitioner filed the instant federal habeas petition on April 19, 2013.

///

///

///

///

# BACKGROUND[2]

On September 2, 2007, Raul left work at 7:00 p.m. and picked up his girlfriend Taji in his van. After eating at Super Taqueria, they went to his cousin's apartment complex where Raul intended to take a shower. They arrived at the parking complex at about 10:00 p.m., and Raul parked the van in a marked space. The area was "pretty dark."

Raul and Taji moved to the back of the van to get some clothes. Raul could see clearly out of the van. He explained that someone outside the van could only obtain a "blurry" view when looking inside because the van had privacy glass on the side windows. Raul looked out the side window and saw a Cadillac, which was "dark... like a root beer color" or "like a gold and brownish" with a red interior. The Cadillac pulled in behind Raul's van. If Raul had backed the van out of the parking space, he would have hit the rear passenger side of the Cadillac. Raul recognized the make of the car as soon as it drove in, stating, "I pretty much know my cars. I love cars."

Raul saw five males in the Cadillac. Two of them exited the Cadillac. A man with a mustache and a dark, horizontally-striped shirt approached the van and looked in the window with privacy glass. The man cupped his hands, put them on either side of his eyes, and leaned forward. The man stood outside the van for a minute to a minute and a half. When Raul was asked whether he saw this person in court, he testified that defendant did not look the same. [FN3] However, he identified a photograph of defendant, which was taken on the night of the arrest, as the person who looked into the van on the night of the shooting.

FN3. At trial, defendant was clean shaven and wore glasses.

When the man asked who was inside the van, Taji responded, "Are we in your parking?" Raul had a "bad feeling" and was about to move to the front of the van, when the man said, "Hebbron." The man stepped back and tapped the arm of the man next to him. Six shots were fired into the van. One bullet grazed Raul's rib cage and another lodged in his leg. A bullet also grazed Taji. Taji drove Raul to the hospital.

Raul was unable to move his leg for a week and a half, and he could not walk without crutches or a cane for two months. He can no longer run because his leg gives out, and he lost his business.

At 11:22 p.m. on the night of the shooting, Officer Chris Balaoro was on patrol when he saw a dark gray-colored Cadillac. He stopped the vehicle because it matched "the color" and "the description" of the vehicle used in the shooting. Defendant was in the right front passenger seat. Nestor Gomez was the driver and Julio Reynoso Rodriguez was in the rear right passenger seat. Defendant was arrested and transported to jail. Photographs taken at the jail reveal that defendant had "Hebbron Street" tattooed on his legs, and "Most Hated," "Salinas," "HBN," "ST," and "13" tattooed on his back. Defendant indicated on the jail intake form

---

[2]The facts of this case are taken from the California Court of Appeal opinion in *People v. Gomez*, No. H036452 (Cal. App. 6 Dist. Aug. 31, 2012). (Ans. Ex. I ("Op").)

that he was a Sureño and a member of Hebbron.

The police did not show Raul a photographic lineup. However, a few days after the shooting, Raul saw a newspaper article about shootings in Salinas that weekend. The article included defendant's photograph. According to Raul, defendant's photograph "matched the one that was in [his] mind" of the man who had been looking into the window of his van. Raul also noted that defendant was wearing different clothes in the newspaper photograph than at the time of the shooting. Raul did not read "too much" of the article.

Raul received monthly payments from a governmental agency regarding his appearance as a witness, but he did not know how much money he had received or for how long. He received some money to fix his vehicle at the end of 2007 or the beginning of 2008, and he was still receiving financial assistance at the time of trial. He was not led to believe that this financial assistance required him to testify in a certain way or to identify a particular person.

On June 15, 2008, Deputy Shaun Moran was working in the Monterey County Jail. He was taking inmates from C pod to the visiting area. After he unlocked the cell doors, he watched one inmate hand an item to defendant, who put the item in his pocket and adjusted his sock. Deputy Moran searched defendant and found a pencil in his pocket and two handwritten notes in his socks. After defendant waived his rights, he asked Deputy Moran "to give him a break," and told him that he had written the notes "to put his thoughts down on paper." Defendant's visitor that day was Joanna Arreola who visited defendant on a regular basis.

One of the notes was a directive to either murder or intimidate Raul and Taji. It stated: "Tell soldier & Chaps we go to jury in 8 days and no one was able to do nothing for [me]. I need you if possible to blast them you can tell Creeper from the hood lives on California Street Chaps knows him he'll do it. [I]f this can't be done for whatever reason at least have a couple of the homies approach the Vato and hyna or any of them and tell them straight out 'if you testify against my homeboys we are gonna smoke you' and flash em a strap callem by their names Raul and Taji. This has to be done <u>mandatory</u> right away. If they testify me and tiny will get life help us out this is the last time I tell you guys I expect you to do it. If we do go to jury on June 25 I want homies to go to our court." [FN4]

> FN4. When the notes were found in defendant's socks, he had a jury [trial] scheduled for June 23, 2008.

The other note was directed to "Nestor," "Dad," and an unnamed third person. The note outlined an alibi for the night of the shooting and indicated that the witnesses were to "stick to the same story."

Joseph Merydith testified as an expert in questioned documents. In his opinion, defendant "probably" wrote the notes found in his socks. He explained that the "probably" standard "in real generic layman's terms, means that probably this person executed this writing, probably nobody else did. To say that probably the sun will rise tomorrow, to put it very

generically."

While defendant was incarcerated at the jail, his telephone calls were recorded between September 4, 2007 and June 16, 2008.

On September 4, 2007, defendant spoke to Bebe. He told Bebe to tell Coco to tell Luis that "someone will try to visit him" and "make sure he tells him not to panic... because after all, we didn't do anything." Defendant further directed that this individual be told "not to take time, to fight, to fight, and to tell his lawyer that it wasn't him." During this conversation, Bebe read a newspaper account of the shooting. Bebe referred to one witness as "that stupid bitch." Defendant responded, "Yeah, the, the one who hangs out over there, man?"

On September 4, 2007, defendant also spoke to Jesse. Defendant told him that "they don't have anything. It's just, just her that's singing and that's it." In another call that day, defendant told Nestor to "bring a pencil and paper."

In a call made between September 2, 2007 and October 10, 2007, defendant asked "UM2" whether he had received a paper from Arreola. UM2 replied that he "already gave it to the soldier."

On June 15, 2008, defendant spoke with Arreola. She told defendant that the police "got the letters" that defendant had sent. When defendant asked if anyone had come with her, she replied that no one had, and that she "kept on calling him and like they would just pick up the phone and like they wouldn't answer."

In another call on June 15, 2008, defendant spoke to an unidentified male and appeared to discuss the seizure of the notes found in his socks at the jail. Defendant asked about a possible charge "if they get someone here inside with a paper that says that they want to give candy to, to, to something, someone." The unidentified male stated that "it could be intimidating a witness or for you to kill somebody they're going to fucken [*sic*] conspiracy to commit murder."

On June 16, 2008, defendant spoke with an unidentified male. Defendant said, "Everything was looking good from that. I blew it." He directed the man to "[t]alk with Luis stupid, talk with him stupid. And, and, and I want, want to put on the batteries, stupid, okay. You know what you guys have to do okay?"

Officer James Knowlton, who was assigned to the gang unit of the Salinas Police Department in 2007, registered defendant on April 7, 2007, as a gang member. At that time, defendant told him that he claimed Hebbron Street, a Sureño criminal street gang in Salinas.

Office Balaoro testified as an expert in the area of gangs, including gangs in Salinas and Sureño criminal street gangs. He testified that the primary activities of a Sureño criminal street gang are car theft and drug sales in order to buy guns. He also identified two crimes committed by Sureño. Hugo Chavez and Hugo Cervantes committed an attempted murder on February 25, 2007. On July 28, 2005, Uriel Martinez committed a shooting. Both incidents resulted in convictions for

attempted murder.

In Officer Balaoro's opinion, defendant was an active Hebbron Street gang member in September 2007. He also testified that Julio Rodriguez was an active Hebbron Street Sureño gang member and Nestor Gomez was a Hebbron Street associate. Officer Balaoro opined that both the shooting and the solicitation offenses were committed for the benefit of the gang.

(Op. at 2-7.)

## DISCUSSION

### I.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the

1  second clause of § 2254(d)(1), if the state court correctly identifies the governing legal

2  principle from the Supreme Court's decisions but "unreasonably applies that principle to

3  the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not

4  issue the writ "simply because that court concludes in its independent judgment that the

5  relevant state-court decision applied clearly established federal law erroneously or

6  incorrectly." *Id.* at 411.

7       "Under the 'unreasonable application' clause, a federal habeas court may grant the

8  writ if the state court identifies the correct governing legal principle from [the Supreme

9  Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

10  case." *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application'

11  clause, . . . a federal habeas court may not issue the writ simply because that court

12  concludes in its independent judgment that the relevant state-court decision applied

13  clearly established federal law erroneously or incorrectly." *Id.* at 411.  A federal habeas

14  court making the "unreasonable application" inquiry should ask whether the state court's

15  application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

16  The federal habeas court must presume correct any determination of a factual issue made

17  by a state court unless the petitioner rebuts the presumption of correctness by clear and

18  convincing evidence.  28 U.S.C. § 2254(e)(1).

19       The state court decision to which Section 2254(d) applies is the "last reasoned

20  decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991);

21  *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned

22  opinion from the highest state court considering a petitioner's claims, the court "looks

23  through" to the last reasoned opinion.  *See Ylst*, 501 U.S. at 805.  In this case, the last

24  reasoned opinion is that of the California Court of Appeal, affirming the conviction.

25  (Ans. Ex. I.)

26       The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

27  there is a heightened level of deference a federal habeas court must give to state court

28  decisions.  *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

1  *Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per
2  curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a
3  highly deferential standard for evaluating state-court rulings' and 'demands that
4  state-court decisions be given the benefit of the doubt.'"  *Id.* at 1307 (citation omitted).
5  With these principles in mind regarding the standard and limited scope of review in which
6  this Court may engage in federal habeas proceedings, the Court addresses Petitioner's
7  claims.

8  **II.**    **Legal Claims and Analysis**

9        Petitioner claims the following as grounds for federal habeas relief: (A) ineffective
10  assistance of counsel based on several failures; (B) Petitioner was denied a fair trial
11  because of the cumulative prejudice of counsel's errors; (C) Petitioner did not receive fair
12  notice that he would be sentenced pursuant to Penal Code section 1866.22(b)(4) because
13  that section was not charged in the information; and (D) there was insufficient evidence
14  to support the gang related crimes and enhancements.

15        **A.**    **Ineffective Assistance of Counsel**

16        Petitioner's first claim is that trial counsel was ineffective for (1) failing to move
17  to suppress the victim, Raul's, identification testimony, (2) failing to impeach Raul with
18  available evidence, and (3) failing to consult an expert witness on the issue of eyewitness
19  testimony and to present expert testimony regarding factors that might lead to an
20  erroneous identification

21        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,
22  Petitioner must establish two things.  First, he must establish that counsel's performance
23  was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under
24  prevailing professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).
25  Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*,
26  that "there is a reasonable probability that, but for counsel's unprofessional errors, the
27  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability
28  is a probability sufficient to undermine confidence in the outcome.  *Ibid.*  A court need

1  not determine whether counsel's performance was deficient if the lack of prejudice is

2  clear. *Id.* at 697.

3      The *Strickland* framework for analyzing ineffective assistance of counsel claims is

4  considered to be "clearly established Federal law, as determined by the Supreme Court of

5  the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v.*

6  *Pinholster*, 131 S. Ct. 1388, 1403 (2011). On federal habeas, a petitioner must show that

7  the state court applied *Strickland* to the facts of his case in an objectively unreasonable

8  manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam). A "doubly"

9  deferential judicial review is appropriate in analyzing ineffective assistance of counsel

10 claims under § 2254. *See Pinholster*, 131 S. Ct. at 1410-11; *Harrington v. Richter*, 131 S.

11 Ct. 770, 788 (2011) (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same). The

12 general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great

13 deference, gives the state courts greater leeway in reasonably applying that rule, which in

14 turn "translates to a narrower range of decisions that are objectively unreasonable under

15 AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough*

16 *v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not

17 whether counsel's actions were reasonable. The question is whether there is any

18 reasonable argument that counsel satisfied *Strickland*'s deferential standard."

19 *Harrington*, 131 S. Ct. at 788.

### 1.    Failure to Suppress Identification

21     Petitioner claims that his trial counsel failed to file a motion to suppress Raul's

22 identification testimony, specifically that Raul saw a newspaper article that included

23 Petitioner's photograph and identified Petitioner as a gang member who had been arrested

24 for the shooting. Petitioner asserts that, notwithstanding the Supreme Court decision in

25 *Perry v. New Hampshire*, 132 S. Ct. 716 (2012), "[t]here is a substantial movement in

26 American jurisprudence which holds that a suggestive identification is subject to

27 exclusion on the general legal principle that unreliable evidence should not be admitted at

28 trial," and relies on four out-of-state court decisions. (Pet. Attach. B at 17.) These state

1    court decisions, however, are not persuasive in the face of AEDPA's clear standard that

2    habeas relief may only be granted where the state court's adjudication of the claim

3    "resulted in a decision that was contrary to, or involved an unreasonable application of,

4    *clearly established federal law*, as determined by the Supreme Court of the United

5    States." 28 U.S.C. § 2254(d)(1) (italics added).

6          Applying the "doubly" deferential standard of review to this claim under § 2254,

7    this Court cannot conclude that the state court unreasonably rejected this claim. The

8    applicable Supreme Court precedent on the issue of identification testimony, as Petitioner

9    concedes, is found in *Perry*, wherein the Court held that the Constitution "protects a

10    defendant against a conviction based on evidence of questionable reliability, not by

11    prohibiting introduction of the evidence, but by affording the defendant means to

12    persuade the jury that the evidence should be discounted as unworthy of credit." 132 S.

13    Ct. at 723. Due process requires suppression of eyewitness identification evidence "when

14    law enforcement officers use an identification procedure that is both suggestive and

15    unnecessary." *Id.* at 718; *see Manson v. Brathwaite*, 432 U.S. 98, 107-09 (1977); *Neil v.*

16    *Biggers*, 409 U.S. 188, 196-98 (1972). The purpose of this rule is "to deter police from

17    rigging identification procedures." *Perry*, 132 S. Ct. at 721.

18          According to the evidence, the police were not involved in the identification at

19    issue and never showed Petitioner a photographic lineup. *See supra* at 4. Rather,

20    Petitioner's photograph happened to appear in a newspaper article a few days after the

21    shooting, and Raul, without having read much of the article, recognized that "defendant's

22    photograph 'matched the one that was in [his] mind' of the man who had been looking

23    into the window of his van." *Id.* Raul was also able to distinguish that "defendant was

24    wearing different clothes in the newspaper photograph than at the time of the shooting."

25    *Id.* Based on this evidence, it cannot be said that the identification was of questionable

26    reliability under *Perry*, 132 S. Ct. 716, where no police "procedure" was involved that

27    rendered the identification suggestive and unnecessary. Therefore, it was not objectively

28    unreasonable for counsel to decide that moving to suppress the evidence would have been

1    denied as meritless. *Strickland*, 466 U.S. at 687-88.

2         Even if we assume that counsel's performance was deficient, Petitioner fails to

3    show that he was prejudiced by it. *See United States v. Gibson*, 690 F.2d 697, 703-04

4    (9th Cir. 1982) (failure to make evidentiary objections does not render assistance

5    ineffective unless challenged errors can be shown to have prejudiced the defense), *cert.*

6    *denied*, 460 U.S. 1046  (1983).  As Respondent points out, the trial court did not

7    exclusively rely on that evidence to find that the prosecution had proved identity:

8              And perhaps if that was the only evidence of who did this, you
        know, maybe the result would be different, I don't know.  I don't need to
9        make that kind of a decision.  And the reason I don't is because of the
        other aspects.  And that is, the defendant was stopped in the Cadillac that
10       does fit the description.  I mean clearly.  The victim knows his cars so
        there's no question about it being a Cadillac.  No doubt about that.  And
11       the defendant is in that vehicle, as I indicated, shortly after the shooting.
        And happens to be in a shirt with stripes that go that way, across.  He
12       happens to have facial hair.

13             The color of the car, I think [the prosecutor's] point is well taken.
        Photographs 33, 34, and 35 all have this root beer flavor to it just because
14       of the lighting.  It's a reflection of the light on the color of – whatever the
        paint is on that car happens to reflect in a way that I would say is fairly
15       described as root beer.

16             We also have some absolutely compelling evidence in the socks of
        the defendant.  The letter soliciting the murder of the eyewitness, the one;
17       the letter clearly suggesting that three people testify according to these
        very detailed instructions, that are being memorized, that includes even
18       the detail of where the vehicle was parked, a map; that are admittedly
        written, according to the defendant, by him[;] both of these letters...
19       capture his thoughts is the way he [RT 968] described it.

20             Without a strong identification from the victim these letters
        identify who did the shooting.  They identify an individual who doesn't
21       want them alive, doesn't want this witness alive at the time that he goes to
        trial on this charge.  That is the same as saying ["]I don't want the person
22       to be able to identify me for what I did on that night.["]  There's nothing
        different.  ["]I know that my father doesn't know what to say, so I'll tell
23       him.  I'll tell other witnesses because my father doesn't know where I was
        or what I was doing when I was off shooting or being with the shooter of
24       this individual.["]

25             Those two items happen to be as persuasive as that kind of
        evidence gets.  They are unambiguous, they have only one interpretation,
26       and that is... consciousness of guilt.  There is no innocent explanation for
        those two letters.

27             ... [E]ven though the defendant is caught with these letters, with
28       these admissions, with these explanations and exclamations of guilt, it

1   doesn't stop there... Instead, we have the [RT 969] phone conversations
    afterwards. Of course, we had the phone conversations before that are all
2   reflective of the same attitude. It is... really an undying energy at self
    preservation.
3
        And it continued on until the day that the victim took the stand
4   here, when the defendant chose to appear clean-shaven, looking entirely
    different, with his glasses on, in front of a victim that would not
5   recognize... if the victim was honest anyway, I can't see how the victim
    would have been able to identify the defendant as the individual. It's just
6   an entirely different appearance, and a different appearance... in many
    aspects from any appearance that he's made here in court prior to that
7   date. Clearly, again, the same kind of conduct.

8        These are the factors that go into making this case really an easy
    case in terms of identification, from the victim's testimony, from the
9   victim having a long and intense look at the individual before the shooting
    occurred, the certainty of his identification when he identified the
10  defendant as the shooter by looking at the newspaper, the certainty of his
    identification of the photograph of the defendant after this arrest, the
11  intimidation and solicitation evidence that was in the socks of the
    defendant, and then the defendant's conduct coming to court with a
12  different appearance. The consciousness of guilt evidence.

13  (Ans. at 8-9, citing Reporter's Transcript ("RT") at 968-70, Ex. B.)

14      As the trial court stated, Petitioner's own actions and behavior indicated a clear

15  consciousness of guilt which identified him as the culprit absent a strong eyewitness

16  identification by the victim. The letters in Petitioner's socks, which he admittedly wrote,

17  clearly identified him as the culprit and their contents and purpose were an

18  "unambiguous" evidence of guilt. *See supra* at 11. The phone conversations were further

19  evidence of Petitioner's motivation for self-preservation based on his guilt. Lastly, his

20  calculated change in appearance on the very day that the victim took the stand was clearly

21  intended to make an in-court identification difficult, which was further indication of a

22  consciousness of guilt. Because the trial court's decision was based on highly persuasive

23  evidence of Petitioner's guilt other than Raul's identification, it cannot be said that

24  Petitioner would have obtained a different result had counsel successfully moved to have

25  the identification evidence suppressed.

26      Because Petitioner has failed to show that counsel's performance with respect to

27  Raul's identification was deficient and that he was prejudiced by it, the Court finds that

28  the state court's rejection of this claim was not contrary to, or an unreasonable application

1    of, clearly established Supreme Court precedent, nor was it based on an unreasonable

2    determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

3    Accordingly, Petitioner is not entitled to habeas relief on this claim.

4                    **2.    Failure to Impeach Witness Testimony**

5           Petitioner's second ineffective assistance of counsel claim is that counsel failed to

6    present evidence to impeach Raul's testimony, specifically with the following: "(1) Raul's

7    prior inconsistent statements to defense investigator Nelson Rodriguez; (2) Raul's prior

8    statement to District Attorney's investigator John Coletti that the man standing outside his

9    van wore a different shirt than the one worn by [P]etitioner when he was arrested shortly

10   after the shooting; and (3) the fact that the District Attorney paid $27,494.92 to Raul."

11   (Pet. Attach. B at 21.)

12                   **a.    Statement to Defense Investigator**

13          Petitioner identifies the following statements by Raul which he made to the

14   defense investigator on December 11, 2007, a little more than three months after the

15   shooting: "(1) due to the tint of the privacy window [on the van], it is 'difficult to look out

16   of the [window] when it is dark outside;' (2) 'he could barely see the facial features' of

17   the man outside the van; (3) he could not recall what the man outside the van was

18   wearing; and (4) the Cadillac was a 'yellowish cream color.'" (Pet. Attach. B at 22.)

19   Petitioner asserts that these statements contradict Raul's testimony at trial that (1) he

20   could clearly see outside his van through the privacy window, (2) his view was good

21   notwithstanding the fact that it was dark outside, and (3) the man standing outside the van

22   had arrived in a "gold" or "brownish" Cadillac. (*Id.*) The first three challenged

23   statements go towards Raul's ability to accurately identify Petitioner as the man standing

24   outside his van, and the fourth to his ability to accurately describe the vehicle involved in

25   the shooting.

26          According to defense counsel's declaration, he had a tactical reason for not using

27   the particular statements to impeach Raul: "I made no attempt to impeach Raul with the

28   statements found in the report since I did not want to provide him with the opportunity to

1   re-confirm his identification of Mr. Gomez as having participated in the crime." (Ans.

2   Ex. F, exhs. at 16.)  Tactical decisions of trial counsel deserve deference when: (1)

3   counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an

4   informed decision based upon investigation; and (3) the decision appears reasonable

5   under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

6   Whether counsel's actions were indeed tactical is a question of fact considered under 28

7   U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law

8   considered under 28 U.S.C. § 2254(d)(1).  *Edwards v. LaMarque*, 475 F.3d 1121, 1126

9   (9th Cir. 2007) (en banc).  Here, the Court finds that counsel's tactical decision deserves

10  deference because it meets all three prongs under *Sanders*.  For prongs 1 and 2, counsel's

11  declaration indicates that he at least recognized the potential of the inconsistent

12  statements but decided that the cost outweighed the benefits; indeed, counsel never

13  submitted the investigator's report into evidence or used it during the trial.  This decision

14  appears reasonable under the circumstances because within the same report, Raul states

15  that he recognized the man who had peered into his van on the night of the shooting as the

16  same man in the newspaper article identified as Petitioner. (Ans. Ex. F, exhs. at 8.) If

17  counsel had used the report to impeach Raul, the prosecutor in all likelihood would have

18  used the same report to reinforce Raul's identification of Petitioner from the newspaper

19  article.  Accordingly, counsel was not deficient with respect to his decision not to use the

20  investigator's report to impeach Raul's testimony with respect to his identification of

21  Petitioner.

22          Even if we assume that counsel acted deficiently, Petitioner cannot show that he

23  was prejudiced by counsel's actions because there was other substantial evidence

24  identifying Petitioner as the culprit as discussed in the previous claim, *i.e.*, the letters in

25  Petitioner's socks written in his own hand, several phone conversations while in jail, and

26  his calculated change in appearance on the day that the victim was to testify were all

27  indications of a consciousness of guilt. *See supra* at 11-12.  Because the trial court's

28  decision was based on highly persuasive evidence of Petitioner's guilt other than Raul's

1  identification, it cannot be said that Petitioner would have obtained a different result had

2  counsel attempted to impeach Raul's testimony with respect to his description of the man

3  outside his van with the inconsistent statements in the investigator's report.

4        Nor can it be said that counsel was remiss for not using the report to attack

5  Petitioner's identification of the Cadillac involved in the incident. According to Raul's

6  statement to the defense investigator, he described the car as "'yellow, cream color.'"

7  (Ans. Ex. F, exhs. at 5.) At trial, Raul described the Cadillac as "dark, like... maybe like a

8  root beer color," (RT 347), but on cross-examination, he said it was "root beerish" and

9  "maybe like a gold and brownish," (RT 369). The police officer who stopped Petitioner's

10  car called it a "dark gray Cadillac." (RT 667.) In closing argument, the prosecutor stated

11  as follows:

> ... if you look through the series of photographs of that Cadillac you will
> see that depending on the light it literally changes color. So it appears
> silver in one, brown in another, black in a different one. And so I don't
> think that – I'm not even sure what color it frankly is.

(RT 936.)

15        The fact that the ambiguity of the actual color of the car was raised at trial made it

16  less likely that the defense would have benefitted by the use of Raul's inconsistent

17  statement in the investigator's report. Rather, Raul's specific description with respect to

18  the rest of the car, *i.e.*, its interior color and detailed wheel features, (Ans. Ex. F, exhs. at

19  5), remained uncontested and would likely have reinforced the accuracy of his car

20  identification.

21        Lastly, Petitioner was not prejudiced by the failure to impeach with respect to the

22  car color. The trial court found:

> ...the defendant was stopped in the Cadillac that does fit the
> description. I mean clearly. The victim knows his cars so there's no
> question about it being a Cadillac. No doubt about that. And the
> defendant is in that vehicle shortly after the shooting...

> The color of the car, I think [the prosecutor's] point is well taken.
> Photographs 33, 34, and 35 all have this root beer flavor to it just because
> of the lighting. It's a reflection of the light on the color of – whatever the
> paint is on the car happens to reflect in a way that I would say is fairly
> described as root beer.

1  (RT 968.)  The trial court acknowledged Raul's expertise with respect to cars and

2  accepted the prosecutor's argument that the color of the car changed depending on the

3  lighting.  Even if counsel had argued that Raul had described the color of the car as

4  "yellow, cream color" to the defense investigator rather than "root beer," it was not likely

5  to have changed the trial court's decision that Petitioner had been stopped in the same car

6  involved in the shooting.

7  　　　Based on this record, Petitioner has failed to show that the result of the proceeding

8  would have been different but for counsel's failure to use the investigator's report to

9  impeach Raul's testimony.  *See Strickland*, 466 U.S. at 694.  Accordingly, the state

10  court's rejection of this claim was not contrary to, or an unreasonable application of,

11  clearly established Supreme Court precedent, nor was it based on an unreasonable

12  determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

13  Petitioner is not entitled to federal habeas relief on this claim.

14  　　　　　　　　　**b.**　　**Statement to DA's Investigator**

15  　　　Petitioner next argues that counsel should have impeached Raul's testimony with a

16  prior statement to the District Attorney's investigator that the man standing outside his

17  van wore a different shirt than the one worn by Petitioner when he was arrested shortly

18  after the shooting.  At trial, Raul testified that he was interviewed by John Coletti, on

19  behalf of the prosecution, a week before he testified.  (RT 383-84.)  According to the

20  report, Coletti showed Raul a picture of Petitioner in a green striped shirt.  (Ans. Ex. F,

21  exhs. at 11.)  Raul said that "it is the same subject he saw in the newspaper that was

22  present with the subject who shot him."  (*Id.*)  Raul then asked Coletti if the shirt worn by

23  the person in the photograph "was the same shirt that he wore that night."  (*Id.*)  After

24  Coletti stated that it was, Raul said "he thought the shirt was darker and had larger

25  stripes."  (*Id.*)  Petitioner asserts that counsel should have used the latter statement,

26  arguing as follows: "Although Raul purported to identify [P]etitioner as the man who

27  stood outside his van, he told Investigator Coletti that the perpetrator had worn a different

28  shirt than the one worn by [P]etitioner that night."  (Pet. Attach. B at 25.)

1    Petitioner's claim is without merit.  As Respondent asserts, Petitioner has taken

2  the statement out of context and mischaracterized it.  (Ans. at 19.)  When asked if he

3  recognized the "subject," Raul's response was not ambiguous.  By asking whether the

4  subject was wearing the same shirt on the night of the shooting, Raul was not implying

5  that he may have been mistaken about his identification of the subject because the shirt he

6  was wearing was different.  Rather, Raul was questioning his recollection of the shirt

7  itself.  This is further bolstered by the fact that earlier in the statement, when asked if he

8  remembered what the subject wore that night, Raul stated that he wore a "'a dark golfing

9  type shirt that had stripes.'"  (Ans. Ex. F, exhs. at 11.)  Although Raul's recollection of

10  the shirt may have been vague, his identification of the subject, *i.e.*, Petitioner, was never

11  uncertain as indicated in Coletti's report.  Accordingly, it cannot be said that counsel was

12  deficient with respect to this impeachment evidence.  *See Strickland*, 466 U.S. at 694.

13  Petitioner is not entitled to relief on this claim.

### c.    **Payments to Victim**

15    Petitioner asserts that counsel should have introduced evidence that the District

16  Attorney paid $27,494.92 to Raul.  (Pet. Attach. B at 21.)  Counsel admits in his

17  declaration that he received a chart from the prosecutor which provided a detailed

18  accounting of the funds that the District Attorney's office paid to Raul, which disclosed a

19  total amount of $27,494.92.  (Ans. Ex. F, exhs. at 16.)  Counsel states that he cross-

20  examined Raul regarding the amount paid to him, but admits that he did not introduce the

21  chart into evidence nor ask Raul whether he had been paid a total of $27, 494.92.  (*Id.*)

22    This claim fails because Petitioner cannot show that he was prejudiced.  At trial,

23  counsel did in fact raise the point that Raul received funds from the DA's office which

24  enabled him to be present at trial.  (RT 378.)  During cross-examination, counsel

25  established that Raul could not even approximate how much money he had received, (*id.*

26  at 378-79), or for how long, (*id.* at 379-80).  After Raul claimed that he wanted the money

27  only for his van to be fixed, (*id.* at 380), counsel got him to admit that he continued to

28  receive money at the time of trial even though the van had been fixed several years before

1    then, (*id.* at 380-81).  Petitioner contends that the fact that Raul received funds from the

2    DA's office was highly probative of bias, but counsel did in fact present this evidence

3    with his lengthy cross-examination in this regard.  The cross-examination successfully

4    showed that the Raul had been receiving money for three years, *i.e.*, starting from shortly

5    after the incident in 2007 through the date of trial in 2010, and that it was likely a

6    significant amount as indicated by the fact that it was used to restore Raul's van and

7    Raul's inability to approximate the full amount.  Entering the specific amount into

8    evidence was not likely to increase the impact of this evidence on the trial court.

9    Accordingly, it cannot be said that counsel was deficient with respect to this impeachment

10   evidence.  *See Strickland*, 466 U.S. at 694.  Petitioner is not entitled to relief on this

11   claim.

12              **3.**      **Failure to Utilize Expert Witnesses on Eyewitness Identification**

13          Petitioner claims that counsel should have consulted with an expert on the issue of

14   eyewitness identification and presented such testimony at trial.  As Respondent points out,

15   because the trier of fact was a judge, not a jury, counsel could reasonably conclude that

16   the trier of fact was sufficiently knowledgeable about the pitfalls of eyewitness

17   identification not to require further education on the subject.  (Ans. at 21.)  Furthermore,

18   this claim also fails because Petitioner cannot show prejudice.  As discussed at length in

19   his previous claims, the issue of identity was thoroughly addressed and an expert on the

20   matter was not likely to change the trial court's findings with respect to the identity of

21   Petitioner as the perpetrator based on other overwhelming evidence.  *See supra* at 11-12,

22   13-14.  Accordingly, Petitioner is not entitled to relief on this claim.  *See Strickland*, 466

23   U.S. at 694.

24       **B.**    **Cumulative Effect of Counsel's Errors**

25          Petitioner's last claim that he was denied a fair trial because of the cumulative

26   prejudice of counsel's errors is without merit because the Court has found no merit to any

27   one of Petitioner's ineffective assistance of counsel claims.  Where there is no single

28   constitutional error existing, nothing can accumulate to the level of a constitutional

1  violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*,

2  292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe*

3  *v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996). Accordingly, Petitioner is not entitled to

4  federal habeas relief on this claim.

5  **C.   Fair Notice of Sentence**

6  Petitioner claims that the trial court violated his due process right to notice by

7  aggravating his sentence in count eight for an enhancement under California Penal Code

8  section 186.22(b)(4)(c) when the information charged an enhancement under section

9  186.22(b)(1).

10  The state appellate court rejected this claim on appeal:

11  Count eight of the information charged defendant with a violation of section 136.1 (dissuading a witness). The information also charged a

12  gang allegation pursuant to "section 186.22 (b)(1)" in connection with this offense. The trial court returned a guilty verdict on count eight and found

13  the gang allegation to be true. At the sentencing hearing, the trial court imposed a sentence of 14 years to life on count eight under section 186.22,

14  subdivision (b)(4)(C). [FN5]

15  FN5. The term of seven years to life was doubled since the trial court found a strike conviction to be true.

16

17  Section 186.22, subdivision (b)(1) mandates additional determinate terms for gang-related offenses "[e]xcept as provided in paragraphs (4) and

    (5)...." [FN6] Subdivision (b)(4) requires an indeterminate term for

18  various gang-related offense and specifies the minimum terms in subsequent subsections. [FN7] Subsection (b)(4)(C) states the minimum

19  term as seven years for "threats to victims or witnesses, as defined in Section 136.1." Both subdivisions (b)(1) and (b)(4) apply when the

20  underlying crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to

21  promote, further, or assist in any criminal conduct by gang members...." (§ 186.22, subd. (b)(1), (4).)

22

23  FN6. Section 186.22, subdivision (b)(1) provides: "Except as provided in paragraphs (4) and (5), any person who is convicted of a

24  felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to

25  promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and

26  consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be

27  punished as follows: [¶] (A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of

28  two, three, or four years at the court's discretion. [¶] (B) If the felony is a serious felony, as defined in subdivision (c) of Section

1192.7, the person shall be punished by an additional term of five years. [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

FN7. Section 186.22, subdivision (b)(4) provides: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶]...[¶] (C) Imprisonment in the state prison for seven years, if the felony is extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1."

"'Due process requires that an accused be advised of the specific charges against him so he may adequately prepare his defense and not be taken by surprise by evidence offered at trial. [Citations.]'" (*People v Mancebo* (2002) 27 Cal.4th 735, 750 (*Mancebo*).)

Here, the information did not expressly allege that defendant was subject to an indeterminate sentence of seven years to life under section 186.22, subdivision (b)(4). However, the information alleged every fact necessary to place defendant on notice of what conduct he had to defend against as well as the punishment set forth in subdivision (b)(4). The information alleged defendant dissuaded a witness "for the benefit of, at the direction of, or in association with SURENO CRIMINAL STREET GANG, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Thus, the information alleged the operative language in subdivision (b)(1) which was identical to the language in subdivision (b)(4), and consequently defendant was notified of the specific charges against him. He was also notified of the potential indeterminate sentence. Section 186.22, subdivision (b)(1) sets forth various sentencing options "except as provided in paragraphs (4) and (5)[.]" Paragraph (4) applies when a defendant is convicted of dissuading a witness. Thus, the information provided notice to defendant that he would be punished under subdivision (b)(4) if he were convicted of dissuading a witness and the gang enhancement were found true. Accordingly, defendant was not deprived of due process.

*Mancebo, supra,* 27 Cal.4th 735 does not compel a contrary conclusion. In *Mancebo,* the information charged the defendant with several offenses arising from sexual assaults on two victims on separate occasions. (*Mancebo,* at p. 740.) The information also alleged that the defendant was eligible for a life sentence under section 667.61 due to three circumstances: kidnapping; firearm use; and binding of the victim. (*Mancebo,* at p. 740.) The information further alleged enhancements for personal gun use pursuant to section 12022.5. (*Mancebo,* at p. 740.) The jury found the defendant guilty as charged and found all the enhancements to be true. (*Ibid.*) Recognizing that section 667.61 precluded the gun use from being employed under both sections 667.61 and 12022.5, the trial court substituted the unpled circumstance under section 667.61 that the offenses involved multiple victims, and imposed sentence under both

sections 667.61 and 12022.5. (*Mancebo*, at p. 740.) *Mancebo* found a violation of due process, explaining that "no factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a). Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) *and* use the circumstance of gun use to secure additional enhancements under section 12022.5(a)." (*Mancebo*, at p. 745.)

In *Mancebo*, the fact that there were multiple victims was insufficient to notify the defendant that he could be sentenced under an unpled circumstance under section 667.61. In contrast to *Mancebo*, here, the enhancement in the information specifically pleaded the same facts under section 186.22, subdivision (b)(1) that would have been pleaded under section 186.22, subdivision (b)(4). Moreover, unlike in *Mancebo*, given that subdivision (b)(1) specifically referenced subdivision (b)(4), defendant was put on notice of the punishment outlined in subdivision (b)(4). *Mancebo* also observed that section 667.61 required that a circumstance be pleaded and proved. (*Mancebo, supra*, 27 Cal.4th at pp. 743-744.) There is no similar requirement in section 186.22, subdivision (b)(4). Thus, *Mancebo*, is not controlling in the present case.

Defendant also relies on *People v. Botello* (2010) 183 Cal.App.4th 1014 (*Botello*). *Botello* rejected the People's contention that "the firearm findings under section 12022.53, subdivisions (b), (c), and (d) [could] be saved by applying, for the first time on appeal, the uncharged provision of section 12022.53, subdivision (e)(1)." (*Botello*, at p. 1017.) *Botello* reasoned: "[A]pplying section 12022.53, subdivision (e)(1), which was not charged, would violate the language of that subdivision (which requires that it be pled) and the notice requirement of due process. We also conclude that by its failure to plead subdivision (e)(1), failure to ensure jury findings under that subdivision, failure to raise the provision at sentencing, and obtaining a sentence that in fact violated subdivision (e)(1), the prosecution forfeited its right to rely on that subdivision." (*Botello*, at p. 1017.)

*Botello* is readily distinguishable from the case before us. First, as previously stated, section 186.22, subdivision (b)(4) does not require that it be pleaded in the information. Second, in *Botello*, the information pleaded enhancement allegations that required personal use of a firearm (§ 12022.53, subds. (b), (c), and (d)), but the People sought to substitute a sentencing enhancement that did not require use (§ 12022.53, subd. (e)). Unlike in *Botello*, here, the information alleged the same facts that would have been alleged under section 186.22, subdivision (b)(4). Third, the issue was raised at sentencing and the sentence imposed did not violate subdivision (b)(4). Thus, *Botello* does not support defendant's position.

In sum, since section 186.22, subdivision (b)(1) explicitly refers to subdivision (b)(4) and the factual allegations in the two subdivisions are identical, the trial court did not err by imposing sentence pursuant to section 186.22, subdivision (b)(4).

1    (Op. at 11-15.)

2        It is clearly established federal law that a criminal defendant has a Sixth

3    Amendment right to be informed of any charges against him, and that a charging

4    document, such as an information, is the means by which such notice is provided. *Gautt*

5    *v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007) (citing *Cole v. Arksansas*, 333 U.S. 196, 201

6    (1948). The Supreme Court "has never held that non-charging document sources can be

7    used to satisfy the Constitution's notice requirement" where the defendant claims that he

8    never received sufficient notice of the underlying charge. *Id.* at 1009 (defendant charged

9    with a sentence enhancement under one subsection of a statute could not be sentenced

10   under another subsection that had more requirements and carried a stiffer penalty).

11   However, the habeas court can look to sources other than the information for evidence

12   that the defendant did receive adequate notice of the theory of a case (e.g., felony murder)

13   if he received theory of a case . *See id.* at 1009.

14       To determine whether a defendant has received fair notice of the charges against

15   him, the court looks first to the information. *See James v. Borg*, 24 F.3d 20, 24 (9th Cir.),

16   *cert. denied*, 513 U.S. 935 (1994); *Lincoln v. Sunn*, 807 F.2d 805, 812 (9th Cir. 1987).

17   The principal purpose of the information is to provide the defendant with a description of

18   the charges against him in sufficient detail to enable him to prepare a defense. *See James*,

19   24 F.3d at 24; *United States v. Lane*, 765 F.2d 1376, 1380 (9th Cir. 1985). An

20   information is not constitutionally defective if it states "the elements of an offense

21   charged with sufficient clarity to apprise a defendant of what to defend against," *Miller v.*

22   *Stagner*, 757 F.2d 988, 994 (9th Cir.) (quoting *Russell v. United States*, 369 U.S. 749,

23   763-64 (1962)), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048,

24   *and cert. denied*, 475 U.S. 1049 (1986), even if it does not state the method by which the

25   crime was committed, *Calderon*, 59 F.3d at 1009. *See, e.g., Brodit v. Cambra*, 350 F.3d

26   985, 989 (9th Cir. 2003) (charging a defendant with the crime of three or more acts of

27   sexual abuse in a specified time period, without identifying the precise dates when the

28   abuse occurred, did not clearly violate clearly established Supreme Court law). "An

1   explicit citation to the precise statute at issue is best, but a 'brief factual recitation in the
2   information' can also suffice.'" *Gautt*, at 1004 (citation omitted).
3        Petitioner's claim is without merit.  As determined by the state appellate court, the
4   information "alleged every fact necessary to place [Petitioner] on notice of what conduct
5   he had to defend against as well as the punishment set forth in subdivision (b)(4)." *See*
6   *supra* at 20.  According to the information, count eight charged Petitioner with a violation
7   of § 136.1, *i.e.*, dissuading a witness, and a gang allegation in connection with the offense
8   under § 186.22 (b)(1).  *See supra* at 19.  Section 186.22, subdivision (b)(1) mandates
9   additional determinate terms for gang-related offenses and makes specific reference to
10  "paragraphs (4) and (5)."  *Id.*  Thereby, Petitioner had notice that subdivision (b)(4)
11  requires an indeterminate term for various gang-related offense and that it specifies the
12  minimum terms in subsequent subsections, *e.g.*, subsection (b)(4)(C), which states the
13  minimum term as seven years for "threats to victims or witnesses, as defined in Section
14  136.1."  *Id.*  According to the specific language of both paragraphs, subdivisions (b)(1)
15  and (b)(4) apply when the underlying crime was "committed for the benefit of, at the
16  direction of, or in association with any criminal street gang, with the specific intent to
17  promote, further, or assist in any criminal conduct by gang members...." *Id.* at 19-20.
18  The state appellate court pointed out that the information specifically alleged that
19  Petitioner dissuaded a witness "'for the benefit of, at the direction of, or in association
20  with SURENO CRIMINAL STREET GANG, with the specific intent to promote, further,
21  or assist in any criminal conduct by gang members.'"  *See supra* at 20.  The state court
22  was therefore not unreasonable in concluding that the information "alleged the operative
23  language in subdivision (b)(1) which was identical to the language in subdivision (b)(4),
24  and consequently [Petitioner] was notified of the specific charges against him." *Id.*  On
25  this record, it cannot be said that the information at issue was constitutionally deficient
26  under *Miller v. Stagner*, 757 F.2d at 994.  Furthermore, it clearly meets *Gautt*'s holding
27  that a "'brief factual recitation in the information' can also suffice.'" 489 F.3d at 1004.
28       Lastly, Petitioner's reliance on the state court decisions of *Mancebo* and *Botello* is

1  not persuasive. As thoroughly discussed by the state appellate court, these two state court

2  cases are factually distinguishable from the case at bar. *See supra* at 20-21.

3  Furthermore, even if his argument that the lower court misapplied state supreme court

4  precedent was correct, the Supreme Court has repeatedly held that federal habeas writ is

5  unavailable for violations of state law or for alleged error in the interpretation or

6  application of state law. *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011); *Estelle*

7  *v. McGuire*, 502 U.S. 62, 67-68 (1991); *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Peltier*

8  *v. Wright*, 15 F.3d 860, 861-62 (9th Cir. 1994).

9        Accordingly, the state court's rejection of this claim was not contrary to, or an

10  unreasonable application of, clearly established Supreme Court precedent, nor was it

11  based on an unreasonable determination of the facts in light of the evidence presented. 28

12  U.S.C. § 2254(d). Petitioner is not entitled to federal habeas relief on this claim.

13        **D.    Insufficient Evidence**

14        Petitioner's last claim is that there was insufficient evidence to support the guilty

15  verdicts for counts 6 and 10 and gang enhancement verdicts in counts 1-5 and 7-9.

16  Specifically, Petitioner claims that the People failed to prove the two elements required to

17  show violations of both subdivisions (a) and (b) of section 186.22, *i.e.*, "primary

18  activities" and "pattern of criminal gang activity." (Pet. Attach. C at 25.)

19        The Due Process Clause "protects the accused against conviction except upon

20  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

21  which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who

22  alleges that the evidence in support of his state conviction cannot be fairly characterized

23  as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt

24  therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979),

25  which, if proven, entitles him to federal habeas relief, *see id.* at 324.

26        The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal

27  habeas proceedings...." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam)

28  (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as

1   factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in

2   "fine-grained factual parsing" to find that the evidence was insufficient to support

3   petitioner's conviction).  A federal court reviewing collaterally a state court conviction

4   does not determine whether it is satisfied that the evidence established guilt beyond a

5   reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510

6   U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson*

7   is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold

8   of bare rationality").  The federal court "determines only whether, 'after viewing the

9   evidence in the light most favorable to the prosecution, any rational trier of fact could

10  have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982

11  F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could

12  have found proof of guilt beyond a reasonable doubt, has there been a due process

13  violation.  *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d

14  988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S.

15  1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

16  Cir.), *cert. denied*, 469 U.S. 838 (1984).

17      After AEDPA, a federal habeas court applies the standards of *Jackson* with an

18  additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

19  Generally, a federal habeas court must ask whether the operative state court decision

20  reflected an unreasonable application of *Jackson* to the facts of the case.  *Coleman*, 132 S.

21  Ct. at 2062; *Juan H.*, 408 F.3d at 1275 (quoting 28 U.S.C. § 2254(d)).  Thus, if the state

22  court affirms a conviction under *Jackson*, the federal court must apply § 2254(d)(1) and

23  decide whether the state court's application of *Jackson* was objectively unreasonable.  *See*

24  *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010); *Sarausad v. Porter*, 479 F.3d 671, 677-

25  78 (9th Cir. 2007).  To grant relief, therefore, a federal habeas court must conclude that

26  "the state court's determination that a rational jury could have found that there was

27  sufficient evidence of guilt, i.e., that each required element was proven beyond a

28  reasonable doubt, was objectively unreasonable."  *Boyer v. Belleque*, 659 F.3d 957, 964-

1  965 (9th Cir. 2011).

2  The state appellate court reviewed the relevant law for this claim:

3  "'On appeal we review the whole record in the light most favorable to the judgment to determine whether it disclosed substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*). The same standard applies to our review of evidence to support a gang enhancement finding. (*People v. Caitlin* (2001) 26 Cal.4th 81, 139, overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242.)

8  Section 186.22, subdivision (f) defines a "'criminal street gang'" as a "a group of three or more persons" that has as "one of its primary activities the commission of one or more of the criminal acts enumerated" in the statute. A criminal street gang must also have "a common name or common identifying sign or symbol" and its members must "engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

12  (Op. at 7-8.) The Court will review each element in turn.

13  ### 1.   <u>"Primary Activities" Element</u>

14  Petitioner claims that the prosecution's evidence on the element of "primary

15  activities" element was insufficient. He asserts that the prosecution only asked one

16  question regarding this element to Officer Balaoro, and that his response was insufficient

17  because he "failed to provide any specifics as to how, where or when the alleged drug

18  dealing occurred. Absent such specifics, it cannot be said that there was an adequate

19  showing regarding the primary activities element." (Pet. Attach. C at 27-28.)

20  The state appellate court rejected this argument:

21  "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Expert testimony may be used to establish that one of the group's primary activities is the commission of statutorily enumerated offenses. (*Id.* at p. 324.) However, such testimony must be based on reliable information. Thus, a gang expert may base his opinion regarding a gang's primary activities on conversations with gang members, his personal investigation of crimes committed by gang members, and information provided by his colleagues. (*People v. Gardeley* (1996) 14 Cal.4th 605, 620 (*Gardelely*).)

27  Here, Officer Balaoro testified as an expert regarding criminal street gangs in Salinas. In 2007, he was a member of the Violence Suppression Unit, commonly referred to as the gang unit, and his duties included

gathering intelligence regarding gang activity. Officer Balaoro had received over 124 hours of formal gang training. He also talked to active gang members on a daily basis, both in a custodial setting and in "casual conversation[s]." He had participated in a "large number" of gang investigations, had made gang arrests, and was involved in serving search warrants on gang members. Though his work included both Norteno and Sureno gangs, his colleagues referred to him as "the Sureno expert, specifically the Hebbron expert" because he "knew everybody in Hebbron." He testified that the "primary activities for a Sureno criminal street gang [are] to steal cars, sell drugs. They do this in order to buy guns. That's to retaliate or protect themselves against rival gang members such as the Nortenos."

Though defendant acknowledges that the sale of drugs is specified in section 186.22, he urges that Officer Balaoro's testimony was insufficient to prove the primary activities element. He asserts that the officer "failed to provide any specifics as to how, where or when the alleged drug dealing occurred."

Defendant[] relies primarily on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*). In that case, the expert witness testified that Varrio Viejo members committed crimes such as assault with a deadly weapon, murder, and narcotics violations. (*Id.* at p. 611.) In concluding that there was insufficient evidence to support the gang enhancement, the Court of Appeal reasoned: "Lang's entire testimony on this point is quoted above – he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how Lang had obtained the information. He did not directly testify that criminal activities constituted Varrio Viejo's primary activities. Indeed, on cross-examination, Lang testified that the vast majority of cases connected to Varrio Viejo that he had run across were graffiti related. [¶] Even if we could reasonably infer that Lang meant that the primary activities of the gang were crimes to which he referred, his testimony lacked an adequate foundation. 'The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and *be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.* [Citation.]' [Citation.]... We cannot know whether the basis of Lang's testimony on this point was reliable, because information establishing reliability was never elicited from him at trial." (*Alexander L., supra,* 149 Cal.App.4th at p. 611, fn. omitted.)

The present case is distinguishable from *Alexander L.* Here, Officer Balaoro testified regarding his gang training, his daily conversations with gang members, and his participation in gang investigations of Surenos in Salinas. As in *Gardeley, supra,* 14 Cal.4th at p. 620, this testimony provided a reliable basis for the officer's expert opinion as to the Surenos' primary activities. Defendant argues that Officer Balaoro, unlike the expert witness in *Gardeley,* "did not directly tie his opinion to his prior investigatory activities." However, the trier of fact could reasonably draw this inference from Officer Balaoro's testimony. (See *Cravens, supra,* 53 Cal.4th at p. 507 [a reviewing court must presume in support of the judgment every fact reasonable from the evidence].) Thus, there is substantial evidence to support the primary activities element of section 186.22, subdivision (f).

1  (Op. at 8-10.)

2       After viewing the evidence in the light most favorable to the prosecution, it is clear

3  that any rational trier of fact could have found that Officer Balaoro's expert opinion was

4  sufficient to establish the element of "primary activities" beyond a reasonable doubt. *See*

5  *Payne*, 982 F.2d at 338. Before asking Officer Balaoro about the primary activities of the

6  Sureno criminal street gang, the prosecution laid down the foundation for Officer

7  Balaoro's expertise: he had been a member of the gang unit, which involved gathering

8  intelligence regarding gang activity; he had received over 124 hours of formal gang

9  training; he talked to active gang members on a daily basis; he had participated in a "large

10  number" of gang investigations, had made gang arrests, and was involved in serving

11  search warrants on gang members; and his colleagues referred to him as "'the Sureno

12  expert, specifically the Hebbron expert'" because he "'knew everybody in Hebbron.'"

13  *See supra* at 26-27. Then when the prosecution asked Officer Balaoro what the primary

14  activities of the Sureno gang was, he replied that the "'primary activities for a Sureno

15  criminal street gang [are] to steal cars, sell drugs. They do this in order to buy guns.

16  That's to retaliate or protect themselves against rival gang members such as the

17  Nortenos.'" (3 RT at 689.)  Officer Balaoro's expert opinion in this regard was clearly

18  based on the extensive interaction he had with the Sureno gang members and the

19  knowledge he had gained therefrom. The prosecution was not required to obtain specific

20  information as to "how, where or when the alleged drug dealing occurred," and the lack

21  of such specifics here does not render Officer Balaoro's testimony any less reliable.

22  Indeed, based on his extensive knowledge, it is highly likely that Officer Balaoro could

23  have offered such specific information if asked.  Ultimately based on the record, this

24  Court cannot conclude that the state court's determination – that a rational trier of fact

25  could have found there was substantial evidence to support the primary activities element

26  – was objectively unreasonable. *See Boyer*, 659 F.3d at 964-965.  Accordingly, the state

27  court's rejection of this claim was not contrary to, or an unreasonable application of,

28  clearly established Supreme Court precedent, nor was it based on an unreasonable

1    determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

2    Petitioner is not entitled to federal habeas relief on this claim.

3                    **2.    "Pattern of Criminal Gang Activity" Element**

4          Petitioner also claims that Officer Balaoro's testimony with respect to the "pattern

5    of criminal gang activity" element was insufficient evidence.  At trial, Officer Balaoro

6    testified regarding an attempted murder and an unlawful shooting committed by three

7    Sureños.  *See supra* at 5-6.  Petitioner claims that because Officer Balaoro "did not

8    specify the underlying facts and reasoning that he employed in determining that the men

9    in question were Sureños[,]... his opinion cannot constitute substantial evidence to prove·

10   that Sureños engaged in a pattern of criminal activity." (Pet. Attach. C at 32.)

11         The state appellate court rejected this argument:

12              "A gang engages in a 'pattern of criminal gang activity' when its
           members participate in 'two or more' statutorily enumerated offenses (the
13         so-called 'predicate offenses') that are committed within a certain time
           frame and 'on separate occasions, or by two or more persons.' [Citation.]"
14         (*People v. Zermeno* (1999) 21 Cal.4th 927, 930.)

15              Defendant does not challenge the sufficiency of the evidence of the
           predicate offenses.  He argues that "Officer Balaoro did not provide any
16         factual basis for his opinion that the men were Surenos."

17              Defendant relies on *In re Nathaniel C.* (1991) 228 Cal.App.3d 990
           (*Nathaniel C.*).  In that case, when testifying about the pattern of criminal
18         gang activity, "[t]he witness, a South San Francisco police officer, had no
           personal knowledge of the incident and only repeated what San Bruno
19         police told him they believed about the shooting.  Such vague, second hand
           testimony cannot constitute substantial evidence that the required predicate
20         offense by a gang member occurred." (*Id.* at p. 1003.)

21              *Nathaniel C.* is inapposite.  Here, Officer Balaoro testified that he
           was familiar with Chavez and Cervantes and both men were Sureno gang
22         members on February 25, 2007, when they committed an attempted
           murder.  Officer Balaoro also testified that he was familiar with Martinez,
23         who was a Sureno gang member on July 28, 2005, when he committed an
           unlawful shooting.  Given Officer Balaoro's gang training, his daily
24         conversations with gang members, his participation in gang investigations
           of Surenos in Salinas, and his familiarity with Chavez, Cervantes, and
25         Martinez, there was an adequate foundation for his opinion that they were
           Sureno gang members. (*Gardelely, supra,* 14 Cal.4th at p. 620.)
26         Accordingly, there was substantial evidence to support the pattern of
           criminal gang activity element of section 186.22
27

28   (Op. at 10-11.)

1   Petitioner's claim is without merit.  The state court was not unreasonable in

2  finding that there was "an adequate foundation" for Officer Balaoro's opinion that the

3  three incidents mentioned were perpetrated by Sureno gang members. *See supra* at 29.

4  Officer Balaoro's personal knowledge of the three men as well as his gang training,

5  participation in gang investigations and daily conversations with gang members was more

6  than a sufficient basis to render his testimony reliable such that any trier of fact could find

7  there was substantial evidence to support the "pattern of criminal gang activity" element

8  beyond a reasonable doubt. *Payne*, 982 F.2d at 338.  The state appellate court's

9  conclusion in this respect was not objectively unreasonable. *See Boyer*, 659 F.3d at 964-

10  965.  Accordingly, the state court's rejection of this claim was not contrary to, or an

11  unreasonable application of, clearly established Supreme Court precedent, nor was it

12  based on an unreasonable determination of the facts in light of the evidence presented.  28

13  U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

14

15                                    **CONCLUSION**

16        For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.

17        The federal rules governing habeas cases brought by state prisoners require a

18  district court that denies a habeas petition to grant or deny a certificate of appealability

19  ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

20  2254.  Petitioner has not shown "that jurists of reason would find it debatable whether the

21  petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*,

22  529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

23        The Clerk shall close the file.

24        **IT IS SO ORDERED.**

25

26  DATED: _January 16, 2015_

27                                    _____
                                        BETH LABSON FREEMAN
                                        United States District Judge

28